PEOPLE *v.* BURKARD.

CRIMINAL LAW—MURDER—MANSLAUGHTER—NEW TRIAL.

> Conviction of manslaughter of one charged with murder, limited by the court to second-degree murder, is reversed for error in instructions and new trial granted per BLACK, SOURIS, O'HARA, and ADAMS, JJ., but with new trial limited to manslaughter per KAVANAGH, C. J., and DETHMERS, KELLY, and SMITH, JJ.

Appeal from Macomb; Noe (Alton H.), J. Submitted June 4, 1964. (Calendar No. 29, Docket No. 49,872.) Decided January 5, 1965.

Milton Henry Burkard was convicted of manslaughter. Reversed and new trial ordered.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *George N. Parris,* Prosecuting Attorney, and *Richard E. Cyrul,* Assistant Prosecuting Attorney, for the people.

*Joseph W. Louisell* (*Ivan E. Barris,* of counsel), for defendant.

O'HARA, J. Appeal is from a jury conviction of defendant of manslaughter. He was charged with murder. The court limited the jury's verdict to guilty of second-degree murder, or manslaughter, or not guilty. Three errors were assigned; one was abandoned upon oral argument before us. There

---

REFERENCES FOR POINTS IN HEADNOTE
[1] 26 Am Jur, Homicide § 585.

remain the questions of the trial court's refusal to dismiss the second-degree murder count and the claimed reversible error in the charge to the jury.

The relevant facts follow: Defendant, slight of stature, a mild-mannered, almost self-effacing person had worked as a typesetter for 30 odd years. For 8 years he had lived in the pleasant suburb of Detroit, St. Clair Shores.

His next door neighbor for the past 5 to 6 years was the deceased, a strapping, muscular man, much the defendant's junior in age.

The killing occurred August 8, 1961. In the previous March, defendant's wife had undergone serious surgery for the removal of a malignant tumor. She required cobalt treatments postoperatively. Also diagnosed at the time was a heart condition. The maladies left her irritable, excitable, and short-tempered.

Two days prior to the fatal shooting the Burkards, returning from a Sunday outing, found a stake and a twine line along the property line common to them and the deceased. Defendant's wife became inordinately upset about this, urged defendant to inquire into the reason for stringing the line. She continued to press him to do something about it throughout Monday and Tuesday. Her attitude by Tuesday was testimonially described as "furious," and on that afternoon she made an insulting remark about the deceased within earshot of deceased's wife. Throughout this sequence of events, defendant would have no part of the unpleasantness. Finally, obtaining no support from her husband, Mrs. Burkard tore out the stakes and threw them and the twine on deceased's property. Deceased audibly threatened to call the police and announced his intention to replace the stakes and twine.

Defendant at the time was in the basement of his home, a window into which was open. Finally, a

*vis-à-vis* encounter between deceased and defendant's wife took place. She threw the contents of a glass of beer in his face. He called her an unprintable expletive and threatened her with physical attack. Both people were in a frenzied rage. Defendant quite some time previously had changed the storage place of his deer rifle from a closet in his bedroom, where he customarily kept it, to the basement with a view toward repairing or having repaired the front sight. At the time the argument reached its climax, defendant had just gone down to his basement workroom. The shells for his rifle were kept in a suitcase he described as "a little overnight case." The critical testimony as to his actions, after hearing the altercation, is herewith set out:

"*Q.* Then from that moment you * * * found your rifle in the cabinet. The cabinet was closed, I take it?

"*A.* I would say yes, usually is.

"*Q.* So you had to open the cabinet?

"*A.* It's usually closed.

"*Q.* And you had to open it?

"*A.* Yes.

"*Q.* Is it locked?

"*A.* Just a little latch.

"*Q.* So you had to just open it up, open the doors. And where do you keep the gun, in the back or front or where?

"*A.* The what?

"*Q.* Where do you keep it?

"*A.* What?

"*Q.* Towards the back of the locker or underneath clothes or in front where you can readily grab it? Where is it at?

"*A.* It's standing along the side.

"*Q.* Standing along the side in a case?

"*A.* I suppose it was in a case, should have been.

"*Q.* Is this the case, Mr. Burkard?

"*A.* That looks something like that. Let's see that. I presume that's it; it's the type.

"*Q.* Is that the case?

"*A.* I would say yes.

"*Q.* Then you opened the case; is that correct?

"*A.* Well, I don't know whether it was tied or not.

"*Q.* It may have been untied at that time then, so you wouldn't have to untie it, you know?

"*A.* That's right.

"*Q.* In any event, you had to pull the rifle out of here; is that correct?

"*A.* It would have to, yes.

"*Q.* Now, you kept your cartridges in a little overnight case. Was that case open or closed?

"*A.* I believe it was closed. I don't know for sure.

"*Q.* Where was that kept?

"*A.* It was in there.

"*Q.* In the locker?

"*A.* (Affirmative movement of head.)

"*Q.* So you took the case out and opened the case up; is that correct?

"*A.* As far as I remember.

"*Q.* Then where are the cartridges, in the box or loose?

"*A.* It was some loose and some in the box.

"*Q.* Some were loose and some in the box and you took one cartridge, did you say?

"*A.* I might have taken a couple. I'm not sure, but I know I only put one in.

"*Q.* Then you took the rifle and the cartridge, and do you remember putting any cartridges in your pocket?

"*A.* I can't—I don't remember that.

"*Q.* You took the cartridge and the rifle and you started running up these stairs; is that correct?

"*A.* I don't know where I put it in the rifle.

"*Q.* You don't remember where you put the cartridge in the rifle?

"*A.* No, I don't think I put it in the house.

"*Q.* In any event, you grabbed the rifle and cartridge and you started running upstairs. You ran out of the house, I take it, or did you walk out?

"*A.* Well, I say I walked fast. I might have run.

"*Q.* Then you went up upstairs into the kitchen and out the kitchen door; is that correct?

"*A.* No. You come right up the stairway and right out the door. It's straight up.

"*Q.* You come up the stairway and you come out which door, Mr. Burkard? You come out the rear door of the house?

"*A.* What they call the gray [grade] door. Yes, it's straight. You don't go into the kitchen.

"*Q.* You don't go into this enclosed porch area at all?

"*A.* You come right straight out through the basement.

"*Q.* Out the door. So you didn't come through this screened porch?

"*A.* No, came right up.

"*Q.* Your daughter didn't say anything to you on the screened porch then?

"*A.* I don't know anything about that.

"*Q.* I didn't hear you.

"*A.* I don't know anything about that.

"*Q.* Did you hear your daughter testify that she saw you on the screened porch and told you, 'What are you doing, daddy? What are you doing, daddy? Stop.' Didn't you hear that?

"*A.* She must have been confused.

"*Q.* All right. Then you went around the screened porch and over to this area and, if I recall correctly, you say you ran up and brushed your wife or pushed her?

"*A.* That's right.

"*Q.* Do you recall this question, which is part of the statement which is now in evidence, which was taken of you?

"*Mr. Louisell*: May I have the page, please?

"*Mr. Ferris*: Page 17.

"*Mr. Louisell*: Thank you.

*"Q. (By Mr. Ferris, continuing)*:

*" 'Q.* How far away were you from Mr. Stamata-
kis when you pulled the trigger?

*" 'A.* Oh, boy! Not far. Probably not over 10
feet, 12 feet.

*" 'Q.* Ten or 12 feet?

*" 'A.* Yes, if that far'."

It is the position of the defendant that despite
the presumption of malice which attends any killing
with a deadly weapon, the proofs here adduced
negated such presumption. It is further contended
that the total record is barren of any proof which
would make out a prima facie case second-degree
murder, thus allowing the jury to pass upon the
issue of malice, suddenly formed, which is an ele-
ment of that crime. Timely motion for a directed
verdict of acquittal as to the charge of second-degree
murder was made, and denied by the trial judge.
This denial, defendant argues, was reversibly er-
roneous because, had the jury been limited to the
verdicts of guilty of manslaughter or not guilty,
no "compromise" verdict of guilty of manslaughter
would have resulted. We cannot agree. Admit-
tedly, there is no more vexing problem in criminal
jurisprudence than the requirement of proving a
subjective state of mind by external and objective
evidence. The testimony of the defendant cannot
be controlling. It can hardly be expected that one
accused of crime requiring the presence of the legal
concept of malice will testify that he entertained it.
Mere denial of such state of mind by the accused
cannot be conclusive. Judges and juries being un-
equipped with extrasensory perception, or any other
metapsychical powers, the law has established the
rule that the composite jury judgment based upon
all relevant facts surrounding the occurrence is the
best available test. If no evidentiary facts have
been adduced to which this jury consideration can

be applied, the court, under our system, withholds from them the issue. We cannot, as the able trial judge could not, say there was not evidence from which the jury could not reasonably infer that defendant formed the requisite malice. This we believe is true, whether they chose to accept defendant's version of the events leading up to the shooting as contained in his statement to the investigating officer or the different version he gave on the trial.

*People* v. *Marshall,* 366 Mich 498, stressed by defendant, presents a completely different factual background. We have examined the other cases cited by appellant and those contra relied upon by appellee. We deem it necessary only to say in general that this is not a case where an accused had already in his possession a weapon. It is not a case where both parties to the affray were armed. Defendant here had to make the judgment which actuated his movements to open a closet, remove the rifle, open an overnight bag, remove a shell, load the weapon, and go from the basement to the scene of the affray in the yard. These facts are not conclusive, as a matter of law, that defendant did form the requisite legal malice. Neither are they, as a matter of law, conclusive that he did not. They do furnish the evidentiary base to submit under proper instruction the question to the jury. We believe the controlling principle is adequately stated in *People* v. *Collins,* 303 Mich 34, at p 51:

"It was the province of the jury, and not of the court, to decide whether there was much or little testimony which would reduce the crime from murder to manslaughter. While there may be little testimony to reduce the crime to manslaughter, it was for the jury to measure the quantity of proof. *People* v. *Toner,* 217 Mich 640 (23 ALR 433).

" 'It will suffice to say that the testimony justified submitting the case to the jury on the charge of murder, and whether the testimony bearing on that charge was much or little was for the jury and not for the court.' *People* v. *Vanderhoof,* 234 Mich 419.

"The court was not in error in submitting to the jury the issue as to whether defendant was guilty of murder or manslaughter."

Appellant's second claim of error concerns the charge to the jury. It is incontestable that the following quoted portion of the trial court's charge is reversibly erroneous:

"Now it is said, in the matter of self defense which I have mentioned, that we are bound to look at the testimony from the standpoint of the defendant. It must be seen through his eyes if reasonably viewed. *This is the people's request. Self-defense in proper cases is the right of every person, but it will not justify an attempt to take human life unless you are satisfied beyond a reasonable doubt from testimony that an assault in fact was about to be made upon the defendant's wife by the deceased.* The term assault as here used means an attempt or offer on the part of the deceased, Steve Stamatakis, with force and violence, to inflict a bodily hurt upon another." (Emphasis supplied.)

It may be that the learned trial judge was merely stating that the foregoing was a request to charge, rather than his own statement of the applicable law; if so, he should not have read it in his charge. Certainly, later in the charge he stated, with precision and accuracy, the proper test to be applied. However, we may not speculate on what effect the patently erroneous excerpt may have had, in the absence of the trial judge himself instructing the jury to disregard it. We hardly need specify that the test of whether "an assault *in fact* was about to be made upon defendant's wife" was clearly and

reversibly erroneous. The test, of course, was later stated correctly, namely, whether defendant "was actuated by an honest belief that his wife's life was in danger" irrespective of whether it was or was not so *in fact*.

Our decision in *People* v. *Eggleston,* 186 Mich 510, at pp 514 and 515, controls:

"In other portions of the charge the learned trial judge laid down the proper rule. * * * We have said, however, that where conflicting instructions are given, one erroneous and the other without error, it may be presumed that the jury followed that instruction which was erroneous."

Absent specific and clear repudiation of the erroneous charge given, we may not presume that it was not followed. For the reason stated, the judgment of conviction is reversed and a new trial ordered.

SOURIS and ADAMS, JJ., concurred with O'HARA, J.

BLACK, J., concurred in result.

KELLY, J. (*concurring in reversal*). I agree with Brother O'HARA that reversible error in the charge to the jury calls for a reversal of the judgment of conviction and a new trial, but I disagree with his conclusion that the testimony justifies a verdict of guilty of murder in the second degree.

The relationship existing between defendant and deceased during the approximately six years they lived next to each other as neighbors is set forth in the people's brief:

"Prior to the shooting, the deceased and the defendant were cordial and friendly, although they had little contact. The defendant was known by the deceased and the widow as always being a quiet, mild-

mannered, retiring individual and a good neighbor, uniformly well liked. There had never been an angry word between the deceased and the defendant."

The record establishes clearly that while decedent's erection of the string boundary agitated defendant's wife, it did not in any way create in defendant an animus or malice toward deceased.

My Brother's opinion briefly sets forth the fact that as defendant was in his basement an altercation and argument took place between deceased and defendant's wife and the opinion properly states "both people were in a frenzied rage," and that deceased threatened defendant's wife with a physical attack.

That this argument was intense but brief is described in appellee's brief as follows:

"There was name calling, shouting, and loud argument. A neighbor, some several hundred feet away, later described the noise as 'like a hornet's nest.' The shouting lasted only a few minutes and ended when the gun was heard, which provoked the neighbor's wife to remark to her husband, 'You don't suppose he (the deceased) shot her.' "

That the defendant's wife realized the tragic part she played in the shooting was evidenced by her daughter's testimony that immediately after the shooting, "She just sat there, said over and over to herself, 'Oh, my god, why did I pull the stakes up? It's all my fault. It's all my fault. Milton, what did I do to you?' "

The police were called immediately after the shooting and arrived at defendant's home very shortly thereafter, took defendant into custody and brought him to the police station. Before anyone had an opportunity to visit with him, or before any attorney had contacted him, defendant's lengthy

statement was taken. I quote from appellee's brief in regard to that statement:

"In his statement taken that night, the defendant said that the deceased struck his wife, that, somehow or other, he must have put the bullet into the gun, 'that he pointed the gun toward the deceased, yelled to the deceased something to the effect, "knock it off" or, "cut it out" or, "stop," or something.' He stated 'I don't know whether I figured on hitting him or scaring him.' 'When I hollered something at him—at the same time I pulled the trigger.' And the deceased went down. He went back into the house, laid the gun down on the cedar chest in the bedroom and waited for the police."

Testifying in his own behalf, when asked if he intended to kill, defendant answered: "Never. I wasn't mad at the man," and when asked if he could give his reasons for shooting, defendant said: "No. I don't believe I can. All I was interested in was my wife, and I thought he was going to do bodily damage to her."

This Court for a century or more has made clear the meaning of the word "malice" in distinguishing murder from manslaughter, both with respect to the State's duty and the defendant's rights.

In 1862, Justice CHRISTIANCY, in *Maher* v. *People*, 10 Mich 212 (81 Am Dec 781), established the fact that when we refer to "malice" as a necessary element of murder, we refer to acts that are prompted or spring from (p 219) "a wicked, depraved or malignant mind," under conditions that did not create excitement or provocation "liable to give undue control to passion in ordinary men" and, in this same case, this Court made it clear that a presumption of innocence must be considered in determining malice, stating (p 218) "every man is presumed innocent of the offense with which he is charged till he is proved to be guilty, this presumption must apply equally

to both ingredients of the offense—to the malice as well as to the killing."

In *People* v. *Potter*, 5 Mich 1 (71 Am Dec 763), the Court made it clear that while a presumption of malice attends a killing with a deadly weapon, yet there is a limitation to this presumption, stating (p 9):

"Now, it is true, as charged, that if the act of killing was proved, the presumption of law is that it was done with malice aforethought; but this rule only obtains where there is an entire absence of qualifying or explanatory evidence involved in, or deducible from, the manner of the killing. But, malice aforethought is as much an essential ingredient of murder in the second degree, as in that of the first. Without this, the killing would be only manslaughter, if criminal at all."

The trial court instructed the jury:

*In re second-degree murder:* "This offense charged here is that of second-degree murder. In this offense there is a design, an intent to take human life. But in this the premeditation is not present as in first-degree murder. In second-degree murder there is malice but it arises suddenly and previous to the killing and is not premeditated."

*In re manslaughter:* "It is the offense committed without malice or premeditation and as a result of temporary excitement in which the control of the reason is disturbed rather than from any wickedness of heart or cruelty or reckless disposition."

*In re malice:* "Malice * * * includes not only anger, ill will, hatred and revenge, but every unlawful and unjustifiable motive."

There is no proof in the record before us of a design to take life, no anger, ill will, hatred, or revenge in this defendant, who is properly described by Jus-

tice O'HARA as a "mild-mannered, almost self-effacing person," and who is admitted by the people to be "a quiet, mild-manner, retiring individual," who had lived for six years as deceased's neighbor on cordial, friendly terms, without an angry word.

There is no testimony in this record to support the contention that defendant had "a wicked, depraved or malignant mind."

If defendant committed any crime, it was within the court's definition of manslaughter, namely: "As a result of temporary excitement in which the control of the reason is disturbed," such excitement having been caused by the "hornet's nest" altercation between deceased and defendant's wife—an altercation described by Justice O'HARA where "both people were in a frenzied rage," with deceased calling defendant's wife insulting and profane names and threatening her physical harm.

In a December, 1962, decision* we dealt with a case where defendant was charged with first-degree murder and convicted of second-degree murder. In our opinion we called attention to the fact that the "undisputed evidence establishes that defendant was excited and afraid for himself and his family," and in reversing the conviction and remanding for further proceedings, we said (pp 351–353):

"The record fails to disclose any fact that would justify a conclusion that premeditation existed or that there was intent to kill. Clearly, there was no circumstance shown indicating malice aforethought; and if the jury returned a verdict of guilty of murder in the first degree, we would have set it aside as being unsupported by the evidence. See *People* v. *Marshall*, 366 Mich 498.  *  *  *

"There is absolutely nothing in the record which could possibly establish an inference in any reason-

* *People* v. *Hansen,* 368 Mich 344.

able person's mind that the defendant shot at the deceased with malice aforethought, either express or implied.

"We conclude, then, that the charge with reference to murder ought to have been omitted and that it was reversible error for the trial court to instruct with reference to first-degree murder. See *People* v. *Stahl,* 234 Mich 569, with reference to how defendant was prejudiced by this charge when there was no evidence to support the charge. See, also, *People* v. *Gessinger,* 238 Mich 625, and *People* v. *Marshall, supra.*

"We conclude, also, that there was no evidence from which malice could be inferred sufficient to justify the verdict of guilty of murder in the second degree.

"We find, therefore, that reversible error was committed in submitting the charge with reference to both first-degree murder and second-degree murder."

While the jury rejected in our present case the charge of second-degree murder, defendant should not again be subjected to a possible compromise verdict and the charge on retrial should be manslaughter and not second-degree murder.

KAVANAGH, C. J., and DETHMERS and SMITH, JJ., concurred with KELLY, J.