PEOPLE v GARFIELD

Docket No. 92197. Submitted November 10, 1987, at Detroit. Decided February 1, 1988.

Shella A. Garfield was convicted of second-degree murder at the conclusion of a bench trial in Detroit Recorder's Court, M. John Shamo, J. Defendant appealed.

The Court of Appeals *held:*

1. The trial court did not abuse its discretion in determining that defendant was competent to stand trial. The only witness at the competency hearing, the person who conducted a psychiatric examination of defendant, testified that defendant was capable of understanding the nature and object of the proceedings against her, taking into account defendant's epilepsy and the drugs she took for that condition.

2. The trial court did not err in not reevaluating defendant's competence during trial. While a defendant's competence is an ongoing concern of a trial court and may be raised at any time during or after trial, facts which raise a bona fide doubt as to the defendant's capacity to stand trial must be presented before the trial court must raise the issue sua sponte. In this case, there was no indication that defendant was unable to understand the proceedings or assist in her defense subsequent to the competency hearing.

3. In addressing defendant's claim of self-defense at closing argument, the prosecutor did not err in arguing that defendant needed to have a reasonable and honest belief that her life was

REFERENCES

Criminal Law §§ 95-99, 103-106, 111, 112.

Homicide §§ 139 *et seq.*

Modern status of test of criminal responsibility—federal cases. 56 ALR Fed 326.

Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.

Homicide: modern status of rules as to burden and quantum of proof to show self-defense. 43 ALR3d 221.

Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.

See also the annotations in the Index to Annotations under Criminal Law; Homicide.

in danger or that she faced serious bodily harm in order to successfully claim self-defense.

4. Although the trial court did not state on the record what standard it used in determining whether defendant had acted in self-defense, it impliedly rejected the self-defense claim in finding that there was no excuse or justification for the shooting of the victim.

Affirmed.

1. Criminal Law — Competence to Stand Trial.

A determination of competence to stand trial is within the discretion of the trial court; a defendant is presumed to be competent to stand trial and, in order to be found incompetent, the trial court must find that, due to his mental condition, the accused is incapable of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner.

2. Criminal Law — Competence to Stand Trial.

A defendant's competence to stand trial is an ongoing concern of a trial court, and the issue of competence may be raised at any time during or after trial.

3. Criminal Law — Competence to Stand Trial.

A trial court has a duty to raise the issue of a defendant's competence to stand trial if facts are presented which raise a bona fide doubt as to the defendant's competence.

4. Homicide — Self-Defense.

A defendant charged with murder must have had a reasonable and honest belief that his life was in danger or that he faced serious bodily harm in order to claim that he acted in self-defense.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Timothy A. Baughman,* Chief of the Criminal Division, Research, Training and Appeals, for the people.

State Appellate Defender (by *Mardi Crawford*), for defendant on appeal.

Before: Hood, P.J., and R. M. Maher and J. B. Sullivan, JJ.

Hood, P.J. Following a bench trial, defendant was convicted of second-degree murder, MCL 750.317; MSA 28.549, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). Defendant was sentenced to from five to fifteen years imprisonment on the murder conviction, and to a consecutive two-year term for the felony-firearm conviction. Defendant appeals as of right. We affirm.

Defendant was charged with first-degree murder and felony-firearm after the April 16, 1985, shooting death of her neighbor, Charles Lock. Defendant was a thirty-one-year-old widow with three teenage daughters. Defendant suffered from epilepsy, which she controlled with medication. Defendant and her daughters were the upstairs tenants of a two-family flat in Detroit. The bottom flat was occupied by Paula Jarmons and her son, Arthur. Defendant admitted shooting Lock, but claimed she did so in self-defense.

Paula Jarmons testified that on April 16, 1985, she came home from work and sat on the couch by her living room window. She looked outside and saw Lock walking towards her home. Defendant and Arthur were arriving at the same time, from different directions. She heard defendant say to Lock, "don't come up on my porch." Lock raised his hands and said, "I'm not coming on the porch". Lock said he wanted to know why they couldn't get along. Defendant replied, "didn't they tell you?" Lock said, "no, tell me what?" Defendant replied, "wait a minute." The next thing Jarmons saw was a barrel of a rifle, pointed at Lock. She heard a shot and saw Lock fall. She ran to Lock's aid, and bumped the rifle in defendant's hands as a second bullet was shot, causing it to miss Lock. Jarmons testified that she did not see anything in Lock's hands.

Arthur Jarmons also testified that Lock was standing at the bottom of the porch stairs holding his hands up and asking defendant why they couldn't be friends. Arthur testified that he then went into his house and heard a gunshot. He ran to the door and saw Lock lying on the ground and defendant standing with a gun. He also did not see anything in Lock's hands.

Defendant testified that she and her daughters joined the Mt. Sinai House of Prayer Church when they moved into the neighborhood. She withdrew from the church when she found out that her daughters were washing dishes at the church without her knowledge and were taking meat from her freezer to the church. Two weeks after they withdrew from the church, members of Lock's family, who were also members of the church, began harassing and threatening her. On Sunday, two days before the shooting, one of the women in Lock's family threw beer on defendant and her daughter as they walked past Lock's house. Another relative named Lee followed defendant home and said, "girl, don't you know he'll kill you? You're not ready to die yet, are you . . .?" Later, as defendant and her daughter went to the store, Lee tried to run them over with his car. In the store, Lee's ex-wife told defendant that she did not want to see defendant walking around anymore. Defendant was scared, so she and her daughters spent the night at her brother's house. The next day, Monday, defendant filed a complaint at the police station. This report was admitted into evidence. Later on Monday, a young member of Lock's family was playing with one of defendant's daughters after school. Defendant asked the youngster to leave because she did not want any trouble. Minutes later, one of Lock's relatives named Juan returned with the child and hit defen-

dant in the back and in the mouth. Defendant called the police, and the police came and warned Lock's family to stay off defendant's property. However, the police discouraged defendant from pressing charges against Juan. A police report on this incident was also admitted into evidence.

Defendant testified that the next day, Tuesday, the day of the shooting, defendant returned from the store, and Lock was approaching her porch. Lock stated, "I'm going to get you yet."[1] Defendant asked Lock to leave, but he started walking up the porch steps. Defendant also testified that she saw Lock reach into his pocket and pull out a knife, whereupon defendant became "really frightened." She again told Lock to leave, but Lock came up another step. Defendant ran into her house, but accidently left the door open. She knew she had to go back down to close the door, but Lock was still screaming that he was going to get her, so she took her rifle with her. Lock still had the knife in his hands, behind his back, so she shot him. Defendant testified that she did not want Lock to come into her house to "cut [her] and [her] children up." She then ran into her house and called the police.

A folded knife was found underneath Lock's body.

Lieutenant James Lally read into evidence a statement that defendant had made shortly after her arrest. Defendant's statement was substantially the same as her testimony. However, defendant specifically stated that she did not see a weapon on Lock. When asked upon cross-examination why she did not mention a weapon in her statement, defendant testified that she had had a

---

[1] Defendant admitted that this was the first time Lock himself harassed her. The previous threats were all made by members of Lock's family.

seizure in the police car following her arrest, which caused her to forget details.

The court found that defendant did not have the premeditation required for first-degree murder, but found defendant guilty of second-degree murder, finding that defendant shot Lock without excuse or justification.

On appeal, defendant first challenges the court's determination that defendant was competent to stand trial. On June 27, 1985, the court ordered that defendant undergo a psychiatric examination at the Recorder's Court Clinic. A competency hearing was then held on August 22, 1985. At this hearing, Dr. Willie Scott testified that he examined defendant on July 16, 1985, for two hours. Defendant recited to him the events which occurred on April 16, 1985. She described the prior abuse and harassment she had suffered by Lock's family. Based on all she told him, Dr. Scott felt defendant was in contact with reality, and he had no reason to believe that she was unable to accurately perceive events. Dr. Scott testified he had no reason to believe defendant suffered from any delusions or hallucinations which would interfere with her capacity to know reality. When asked by counsel what kind of stress he believed defendant was under at the time of the incident, Dr. Scott testified that defendant's stress centered around fear for her life. Dr. Scott testified that he knew defendant was epileptic and was taking Dilantin and Phenobarbitol. When asked whether the medication would heighten her stress or affect her ability to realistically handle the stress of the abuse and harassment, Dr. Scott replied:

Not being a medical doctor I certainly can't testify regarding the pharmaceutical effects of drugs. However, I am familiar with the behavior of

persons who are undergoing medication. It's been indicated to me that those persons who were suffering from those conditions without treatment might have their conditions exacerbated by stressful activity.

The medication I'm told provides a certain amount of strength. It augments one's capacity to withstand the pressures, all the stress and I had no reason to believe that there was any breakdown of her condition. So, I don't have any clinical information or any behavioral information that would suggest that her ability to handle the situation was weakened in spite of the medications she was taking.

In conclusion, Dr. Scott testified that he felt defendant was capable of understanding the nature and object of the proceedings against her and that she was competent to stand trial. Dr. Scott was the only witness at the competency hearing and following his testimony the court found defendant competent to stand trial.[2]

Defendant's challenge to the competency determination is two-fold. First, defendant argues that the court erred in finding defendant competent to stand trial because Dr. Scott did not know the pharmaceutical effects of the drugs defendant was taking.

MCL 330.2020; MSA 14.800(1020) states:

(1) A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by

---

[2] Defendant also filed a notice of insanity defense. The outcome of this defense is not indicated in the file.

his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

(2) A defendant shall not be determined incompetent to stand trial because psychotropic drugs or other medication have been or are being administered under proper medical direction, and even though without such medication the defendant might be incompetent to stand trial. However, when the defendant is receiving such medication, the court may, prior to making its determination on the issue of incompetence to stand trial, require the filing of a statement by the treating physician that such medication will not adversely affect the defendant's understanding of the proceedings or his ability to assist in his defense.

The determination of a defendant's competence is within the discretion of the trial court. *People v Ritsema,* 105 Mich App 602, 606; 307 NW2d 380 (1981), lv den 413 Mich 934 (1982). We feel the trial court did not abuse its discretion in finding defendant competent to stand trial. Dr. Scott's testimony that defendant understood the nature and object of the proceedings against her was unrefuted. Although Scott did not know the pharmaceutical effects of defendant's drugs, he knew that the medication provided strength and helped patients withstand pressure. There was no testimony that defendant's epilepsy or the drugs she took to control it made her incapable of understanding the nature and object of the proceedings against her or assisting in her defense in a rational manner. Thus, the court did not err in finding defendant competent to stand trial.

Second, defendant argues that the court erred in not reevaluating defendant's competence during trial. Defendant cites the fact that, at the final pretrial conference, defense counsel informed the court that defendant did not always receive medi-

cation in jail and that one night she was found in a pool of blood, and the fact that, at one point during the trial, defendant felt faint and a short recess was taken until she felt better. Whether defendant is competent to stand trial is an ongoing concern of the court, and the issue of competence may be raised at any time during or after trial. *People v Hamm,* 79 Mich App 281, 288; 261 NW2d 288 (1977), lv den 402 Mich 888 (1978). However, evidence of incompetence must be shown. *Id.* It is the trial court's duty to raise the issue of the defendant's competency if facts are presented which raise a bona fide doubt as to the defendant's capacity to stand trial. *People v Mowrey,* 63 Mich App 676, 678; 235 NW2d 23 (1975).

We feel the two instances cited by defendant did not compel the court to conduct a new inquiry into defendant's competence to stand trial. Those instances do not show that defendant was unable to understand the proceedings or assist in her defense. Thus, the court did not err in not reevaluating defendant's competence.

Next, defendant claims that in his closing argument the prosecutor incorrectly stated that the test of self-defense is whether the defendant honestly believed, using a reasonable standard, that her life was in danger or she faced serious bodily harm. Defendant claims that the test for self-defense is an honest, not an honest and reasonable, belief. Defendant claims that, since the trial court did not specifically state its legal conclusions on self-defense, and did not state which test it used, it is unclear whether the court used the erroneous standard propounded by the prosecutor.

In closing argument, the prosecutor stated:

> We have had the defense of self-defense and while it is true that the defense is—whether or not

someone has an honest belief they're in fear of death or great bodily harm, *that honest fear must be judged by reasonable standards. If the person is not the type of person that can be held to a reasonable standard,* there are other defenses such as insanity or diminished capacity which are not before this Court so we're not dealing with a person who is supposedly affected by delusional thinking to the point that their interpretation of reality renders them criminally irresponsible.

Rather, we're dealing with a person before the Court that has to be held by some reasonable standards and whether or not they are honestly in belief of fear or great bodily harm. I believe that's important because the record here shows that no one under that standard could have thought that they had to shoot someone in the head under these circumstances. [Emphasis added.]

In his closing argument, defense counsel stated:

Never once did Miss Garfield ever go and pursue them. They always came after her, either coming down to her place, hitting her, threatening her or trying to run her over with their vehicle. If that doesn't produce fear in a woman alone with three children, then nothing can and nothing will and contrary to what Counsel has said, this is a situation where there was an honest belief that death or great bodily harm could take place.

*It was reasonable for her to believe that.* She did have an honest fear. [Emphasis added.]

In the trial court's findings, the court stated:

The Court has deliberated this matter and does not believe there was premeditation as [there] would be for murder in the first degree, but it also has considered the lesser included offenses as it would instruct a jury to do and it does find that the deceased died on or about April 16th, 1985, and that the offense was committed in the City of

Detroit and that the death was caused by the act of Shella Garfield and that she did shoot him *and that there was no justification or no excuse for the shooting or killing of Mr. Lock.*

I think that the defendant knew that her acts would cause great bodily harm or possibly death and when you fire a rifle at somebody you have to expect they would be seriously hurt or killed and this Court does find the defendant did willfully and wantonly disregard the knowledge of the possible consequences of death or serious injury and I think that the People have proven all of the elements of murder in the second degree, based on the facts that this Court heard that this defendant did go upstairs, bring the rifle down.

When she went in the house she could have just locked the door and solved the problem, but she went upstairs, got the rifle and came downstairs and came out on the porch and shot one time. The second shot may have been accidental so I won't even consider that, but the fact that she went upstairs and got the rifle and came down and shot him, even though he may have had the knife in his hand, the Court believes he did have it in his hand, but it wasn't open. She retreated to safe haven, but then came back out armed. [Emphasis added.]

We feel that no error requiring reversal occurred. First, defense counsel did not object to the prosecutor's argument, and, in fact, seemed himself to argue the reasonable standard, as he used the word "reasonable" in his own closing argument. Second, we are not convinced that the reasonable standard is erroneous. Whether the defendant must have only an honest belief that his life is in danger, or must have an honest *and reasonable* belief, has been a source of confusion in Michigan. Some cases have required only that the defendant honestly believe his life is in danger. *People v Lennon,* 71 Mich 298, 300-301; 38 NW

871 (1888); *People v Burkard,* 374 Mich 430, 438; 132 NW2d 106 (1965); *People v Vail,* 49 Mich App 578, 593; 212 NW2d 268 (1973), rev'd on other grounds 393 Mich 460 (1975); *People v Robinson,* 79 Mich App 145, 156-61; 261 NW2d 544 (1977), lv den 403 Mich 814 (1978); *People v Deason,* 148 Mich App 27, 31; 384 NW2d 72 (1985), lv den 428 Mich 869 (1987). Other cases have required that the defendant's belief be both honest and reasonable. *Pond v People,* 8 Mich 149; 175, 182 (1860); *People v Macard,* 73 Mich 15, 20; 40 NW 784 (1888); *People v Giacalone,* 242 Mich 16, 21-22; 217 NW 758 (1928); *People v Shelton,* 64 Mich App 154, 156-57; 235 NW2d 93 (1975); *People v Lenkevich,* 394 Mich 117, 124; 229 NW2d 298 (1975); *People v Perez,* 66 Mich App 685, 692; 239 NW2d 432 (1976), lv den 397 Mich 824 (1976); *People v Oster,* 67 Mich App 490, 501; 241 NW2d 260 (1976), lv den 397 Mich 848 (1976); *People v Doss,* 406 Mich 90, 102-103; 276 NW2d 9 (1979); *People v Green,* 113 Mich App 699, 704; 318 NW2d 547 (1982).

In *People v Kerley,* 95 Mich App 74; 289 NW2d 883 (1980), lv den 411 Mich 868 (1981), this Court, in reviewing a jury instruction which stated that the defendant could not invoke the doctrine of self-defense unless he "reasonably believed in his own mind" that he was in imminent danger, stated:

> Citing CJI 7:9:01(3) and the commentary thereto at pages 191-194, defendant argues that error was committed because the court used the words "reasonably believed" rather than "honestly believed". See also *People v Robinson,* 79 Mich App 145, 156-161; 261 NW2d 544 (1977). For many years, Michigan case law alternately approved instructions using either the term "reasonably believed", *People v Shelton,* 64 Mich App 154, 156; 235 NW2d 93 (1975), *People v Perez, supra,* or "honestly be-

lieved", *People v Burkard,* 374 Mich 430, 438; 132 NW2d 106 (1965), *People v Robinson, supra.* But as appears from the commentary to cji, it is not the magic words "honestly" or "reasonably" which determine whether the instruction is proper. Instead, the test is whether the language, when read as a whole, makes it clear that defendant's conduct is to be judged from the circumstances as they appeared to the defendant rather than as they would appear to a third party. As was stated in *Perez, supra:*

"Without deciding whether the instructions given were reversibly erroneous, we think that two aspects of self-defense should be consistently emphasized in the instructions upon retrial. First, the self-defense justification for homicide is based upon the circumstances as they appeared to defendant, and not as they actually existed. [citations omitted] Second, those circumstances as they appeared to the defendant must result in a reasonable belief that he, the defendant, is in danger of death or serious bodily harm." 66 Mich App at 692.

The language used by the court was "reasonably believed in his own mind". As such, and given the fact that, unlike the situation in *Robinson,* no objection was made, we believe the jury understood that defendant's justification for firing the gun was to be based on the circumstances as they appeared ("in his own mind") to the defendant. [*Kerley, supra,* pp 81-82.]

In CJI 7:9:01, the Committee drafters stated that they recognized that the term "reasonable belief" is used in some instructions, but that they found the standard to be that of honest belief. However, we note that since those jury instructions were drafted, the Michigan Supreme Court has used the word "reasonable" in its standard for self-defense. In *Lenkevich, supra,* the Court stated:

If attacked by a cotenant or other occupant, as

here, defendant had the right to protect herself if the circumstances caused her reasonably to believe that there was a present and impending necessity so to act to prevent the infliction of death or great bodily harm. [394 Mich 124.]

In *Doss, supra,* the Court stated:

However, like the private citizen, the police officer who claims self-defense must have *reasonably* believed himself to have been in great danger and that his response was necessary to save himself therefrom. See *Pond v People,* 8 Mich 150 (1860); *People v Macard,* 73 Mich 15; 40 NW 784 (1888); and *People v Giacalone,* 242 Mich 16; 217 NW 758 (1928). In *People v Oster, supra,* this rule was reiterated as follows:
"Not only must the defendant believe himself to be in great danger, but that belief must also be reasonable under the circumstances." 67 Mich App 490-501. [406 Mich 102-103. Emphasis in original.]

Until the Supreme Court states otherwise, we adopt the "reasonable and honest" belief standard as the test of self-defense in Michigan. Thus, we feel that the test propounded by the prosecutor was not erroneous.

Even if this test were erroneous, reversal would not be required. The prosecutor's closing argument was just that—a closing argument. This case is not one in which a jury was wrongly instructed. A trial judge is presumed to know the law. Defendant states on appeal that she is not challenging the trial court's findings of fact as insufficient. In finding that there was no justification or excuse for the shooting, the court impliedly rejected defendant's claim of self-defense, and found that defendant did not have an honest and reasonable belief that her life was in danger.

This case is unlike *Green, supra,* in which in a

killing involving a similar fact situation this Court ordered a remand for the trial court to make more specific findings on (1) the circumstances as they appeared to the defendant prior to the shooting and (2) whether the defendant actually believed that he was in danger of death or serious bodily harm. In *Green,* this Court could not determine from the trial court's ruling whether the trial court believed the defendant's version of the circumstances of the shooting. *Green, supra,* p 705. In the instant case, the court's ruling indicates that it substantially believed defendant's version of the facts. The court stated it believed that Lock was coming up the porch steps with a folded knife in his hand, but that defendant used excessive force because she returned with a gun rather than simply locking her door. We do not believe the trial court's failure to state on the record the test it used in determining whether defendant acted in self-defense resulted in error.

Affirmed.