*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
March 3, 2022

v

DIA KENATA-FRANKLIN FISHER,

        Defendant-Appellant.

No. 353601
Wayne Circuit Court
LC No. 18-007305-01-FC

Before: GLEICHER, P.J., and K. F. KELLY and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his bench trial convictions for assault with intent to do great bodily harm, MCL 750.84, discharge of a firearm in a building causing serious impairment, MCL 750.234b(4), discharge of a firearm in a building causing injury, MCL 750.234b(3), and three counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. Defendant was sentenced to 19 months to 10 years' imprisonment for assault with intent to do great bodily harm, 57 months to 20 years' imprisonment for discharge of a firearm in a building causing serious impairment, 43 months to 15 years' imprisonment for discharge of a firearm in a building causing injury, and two years' imprisonment for each felony-firearm conviction. We affirm.

## I. FACTS AND TESTIMONY

On September 2, 2018, defendant shot his brother, Eric Johnson, at a marijuana dispensary where Johnson worked. Two of defendant's cousins, Leon and Nathaniel Barnett,[1] were present at the time. The only eyewitnesses who testified at the bench trial were defendant and Johnson, but the parties stipulated to admit the testimony provided by the Barnetts at the preliminary examination. Although there is no dispute that defendant shot Johnson twice—once in the foot

---

[1] Because Leon and Nathaniel Barnett share a last name, we will refer to them by their first names where necessary to distinguish between them.

and once in the back—the witnesses all provided somewhat conflicting details of the context of the gunshots.

Leon and Johnson both worked at the dispensary, and both were working at approximately 5:00 p.m. on the day of the shooting. Nathaniel and defendant attended a birthday party for Nathaniel earlier in the afternoon. Nathaniel and defendant then went to the dispensary. According to defendant, Nathaniel asked defendant for a ride to the dispensary because Leon had a birthday gift for Nathaniel. According to Nathaniel, he and defendant traveled separately but arrived at the same time. Defendant entered the dispensary. Nathaniel testified that he remained outside; however, the other witnesses all testified that Nathaniel entered with defendant. There were no security cameras in the dispensary.

According to Leon, defendant and Nathaniel entered the shop, whereupon defendant and Johnson began arguing. Leon opined that neither defendant nor Johnson knew that the other would be there. Leon did not know who started the argument, but he opined that it had been "just petty bickering." However, Leon testified that "it got physical fast," and although he did not initially believe the fight would exceed "rassling, like kind of tussling," he then saw defendant holding a gun. He clarified that there were no punches thrown, but rather they grabbed each other. He further testified that both defendant and Johnson were "going for the handgun," whereupon Leon ducked and began yelling for defendant and Johnson to stop. He explained that he tried to break them up, but "didn't really want to get in between them." Leon testified that defendant and Johnson never separated until the incident ended. Leon denied hearing any gunshots, which he admitted might have been because he was yelling, but also because "it happened so fast." However, at some point, he saw defendant run out of the dispensary, and he saw Johnson lying on the ground on his back, with blood coming out of his back.

Nathaniel denied observing the events that transpired inside the shop, although he testified that he heard an argument, to which he paid little attention, followed by "tussling" or "bumping around" and "banging into walls." Nathaniel heard two or three gunshots, followed by seeing defendant run out of the dispensary. According to Nathaniel, he then went inside and discovered Johnson lying on his side. However, elsewhere in his testimony, Nathaniel referred to Johnson lying on his back, and at another point Nathaniel testified that Johnson was laying on his stomach and Nathaniel had to prevent Johnson from trying to turn onto his side.

According to Johnson, when defendant entered with Nathaniel, Johnson approached Nathaniel and gave him a high-five, then asked "why did you bring 'Mr. Steal your shoes,' referring to my brother [defendant]." Johnson explained that approximately three months previously, defendant had stolen Johnson's gym shoes. In response to Johnson's comment, defendant yelled "What up, what up" several times and approached Johnson, which Johnson interpreted as a challenge. Johnson then "felt a blow to my foot" and fell to the ground, following which he felt "a twist in my spine." Johnson testified that he was shot twice, in close enough succession to be described as "a blink." However, upon further examination, Johnson clarified that he fell onto defendant after being shot in the foot, and defendant "pushed me off with his hands," apparently contemporaneously with shooting Johnson in the back. Immediately thereafter, defendant, who had not fallen, stepped over Johnson's body and left. Johnson specifically and repeatedly denied that any kind of fight or tussling occurred. Johnson denied ever carrying a gun, but then conceded that he had carried a gun while working at the store. Johnson denied having

-2-

ever threatened defendant. Johnson also emphasized that he never confronted defendant at the dispensary, but rather, he confronted Nathaniel for having brought defendant.

According to defendant, he entered the dispensary with Nathaniel, gave Leon a high-five, and joked with the two of them about Nathaniel's birthday. A few minutes later, Johnson emerged from another room, approached quickly, "and said something like, 'This the bitch ass Chrysler worker that stole my shoes.'" Defendant "felt like that was a problem," and noted that he had not seen Johnson since kicking Johnson out of his house. Defendant explained that there was "bad blood" between himself and Johnson, arising out of defendant having permitted Johnson to stay in his house. Defendant explained that Johnson would get mad "for the littlest things," was "too wild in my house," and was kicked out for threatening defendant and defendant's girlfriend. At that time, Johnson took defendant's phone, broke defendant's window, "and kind of messed up my house." Because of that, and because Johnson had left some of his clothing at defendant's house, defendant took Johnson's shoes. Johnson had also tried to take defendant's gun away from him. Defendant emphasized that Johnson would be "cool" one minute, "and next minute he flips out," so "you cannot trust him." Defendant knew Johnson to have a gun, but defendant never permitted Johnson to bring the gun into his house.

Defendant testified that he tried to back away and leave, while he and Leon told Johnson to "chill out." However, defendant took out his gun because Johnson "wouldn't let it go." Defendant emphasized that he kept his gun pointed down, and he pulled it out in part because he feared Johnson might have taken it out of his pocket otherwise. Defendant also noted that Johnson had his hands behind his back, where defendant could not see them. Johnson then headbutted defendant into a wall and knocked him to the floor, where Johnson placed him in a headlock. Defendant explained that he has asthma and was having difficulty breathing, so he shot Johnson in the foot. However, Johnson just kept squeezing defendant tighter, and defendant "felt like I had to do something to get him off me." According to defendant, "I still had my gun in my left hand, and I shot him and that is when he jumped off me, and I ran out the door." Defendant explained that Johnson had been on top of him at the time, that Johnson "is a big person," that it "only takes one arm to put someone in a headlock," and Johnson was trying to take the gun. Defendant attempted to clarify on cross examination that Johnson "just flew off all into his body clear up off me" and did "not like a jump and get up and got on his legs and fell down," but was cut off by the prosecutor.[2] Defendant believed he fired his gun a total of four times.

After the shooting, Leon attempted to call 911, but found that he had no signal on his phone. He flagged down an ambulance that happened to be driving by, and the EMTs took Johnson to the hospital. Johnson was found to have a bullet lodged in his spine, and as a result of his injuries, his lower body was paralyzed. It is not disputed that Johnson had been shot in his back, not in his front. Later that day, defendant returned to the scene and turned himself in.

---

[2] The prosecutor also repeatedly emphasized that Johnson was defendant's brother. We might otherwise be concerned that the prosecutor did so for the purpose of injecting an emotional reason for conviction beyond the evidence, see *People v Bahoda*, 448 Mich 261, 282-284; 531 NW2d 659 (1995), but in this case, such concerns are significantly curtailed given that this was a bench trial rather than a jury trial.

## II. PROCEDURAL BACKGROUND

At the conclusion of the bench trial, the trial court observed that "everyone agrees and it was testified to that there was a physical altercation between the brothers, the victim, Eric Johnson, and the Defendant, Dia Fisher." The trial court opined that the Barnetts likely knew more about what occurred than they were willing to disclose. The trial court summarized the evidence as Johnson having been minding his own business when defendant came into Johnson's workplace "and forever altered the course of his life." Although the trial court never actually made a credibility pronouncement in so many words, it obviously found defendant not credible, describing defendant's version of events as "well planned out" and a "well-prepared story." The trial court believed the evidence did not show that defendant intended to kill Johnson. However, it concluded that defendant did not act in self-defense, holding:

> The Court concludes that [defendant] is [sic] did not act in self-defense as the degree of force he used and [sic] was not immediate necessary in the physical altercation with his brother. To repeat an old saying, "You can't bring a gun to a fist fight."

The trial court concluded that, given Johnson's testimony that the two gunshots occurred in "a blink," following which defendant simply stepped over Johnson's body and left without rendering any aid, defendant had intended to commit great bodily harm less than murder. Accordingly, the trial court acquitted defendant of assault with intent to commit murder, MCL 750.83, and one count of felony-firearm, MCL 750.227b, but it convicted defendant of the offenses noted above.

On January 20, 2021, defendant moved this Court to remand this matter to the lower court for an evidentiary hearing. In his motion, defendant indicated that the sole issue at trial was whether defendant was acting in self-defense when he shot Johnson. Defendant asked this Court to remand this case for an evidentiary hearing so that he can establish that he was denied the effective assistance of counsel at trial. Specifically, defendant asserted that trial counsel was deficient for failing to introduce evidence relating to Johnson's previous arrests for assault. According to defendant, Johnson was arrested for misdemeanor assault in October 2015, and felony assault in July 2017 and June 2018. Defendant argued that his knowledge of Johnson's previous arrests for assault leading up to the incident was highly relevant to whether his belief that shooting Johnson was necessary to prevent imminent death or great bodily harm was reasonable. As an offer of proof, defendant provided Johnson's Internet Criminal History Access Tool (ICHAT) information. Defendant also submitted an affidavit prepared by appellate counsel, stating that appellant counsel spoke to defendant's trial counsel on the telephone, and the latter indicated that he could not recall whether he was aware of Johnson's criminal history. On March 24, 2021, this Court entered an order denying defendant's motion to remand for failure to persuade the Court of the necessity of a remand at that time. *People v Fisher*, unpublished order of the Court of Appeals, entered March 24, 2021 (Docket No. 353601).

## III. STANDARDS OF REVIEW

In general, a trial court's factual findings at a bench trial are reviewed for clear error, giving regard to the trial court's special opportunity to evaluate the credibility of witnesses. MCR 2.613(C). A challenge to the great weight of the evidence is also reviewed under the clear error

-4-

standard. *Ambs v Kalamazoo Co Rd Comm*, 255 Mich App 637, 652 n 14; 662 NW2d 424 (2003). A trial court's assessment of credibility is also reviewed for clear error. *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008). "A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Solloway*, 316 Mich App 174, 182-183; 891 NW2d 255 (2016), (quotation marks and citation omitted). "Generally, a verdict is against the great weight of the evidence only when it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Morris*, 314 Mich App 399, 414; 886 NW2d 910 (2016) (quotation marks and citation omitted). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *Dendel*, 481 Mich at 130 (quotation omitted).

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). A trial court's findings of fact are reviewed for clear error and questions of law are reviewed de novo. *Id*. If no evidentiary hearing has been held, this Court's review is generally restricted to mistakes apparent from the record. *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003). However, this Court should consider materials outside the record for the purpose of whether to remand the matter for an evidentiary hearing, especially where a defendant preserved a request for such a hearing. *People v Moore*, 493 Mich 933, 933; 82 NW2d 580 (2013). Even if this Court denies an earlier motion to remand for an evidentiary hearing, this Court retains the authority to revisit that denial after plenary review. See *People v Smith*, 336 Mich App 79, 100; ___ NW2d ___ (2021).

## IV. GREAT WEIGHT OF THE EVIDENCE

As discussed, the trier of fact is generally the exclusive arbiter of witness credibility, and although the trial court made no specific pronouncement here, it obviously felt defendant not to be credible. "Questions regarding credibility are not sufficient grounds for relief unless the 'testimony contradicts indisputable facts or laws,' the 'testimony is patently incredible or defies physical realities,' the 'testimony is material and . . . so inherently implausible that it could not be believed by a reasonable juror,' or the 'testimony has been seriously impeached and the case is marked by uncertainties and discrepancies.' " *Solloway*, 316 Mich App at 183, quoting *People v Lemmon*, 456 Mich 625, 643-644; 576 NW2d 129 (1998). However, it has long been understood that a lone judge sitting as the trier of fact at a bench trial is not entitled to the same degree of deference as would be a jury. *Schneider v Pomerville*, 348 Mich 49, 54; 81 NW2d 405 (1957); *Beason v Beason*, 435 Mich 791, 804; 460 NW2d 207 (1990). Credibility assessments made by a trial judge are not wholly insulated from judicial review. *Beason*, 435 Mich at 804; see also *Miller-El v Cockrell*, 537 US 322, 340; 123 S Ct 1029; 154 L Ed 2d 931 (2003). Furthermore, "doubt about credibility is not a substitute for evidence of guilt." *People v Wolfe*, 440 Mich 508, 519; 489 NW2d 748 (1992).

As defendant correctly argues, the only issue in dispute at defendant's trial was whether defendant acted in self-defense. Under the Self-Defense Act, MCL 780.971 *et seq*., a person who has not or is not engaged in the commission of a crime may use deadly force, where he has the legal right to be, with no duty to retreat, if he honestly and reasonably believes that the use of

deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual. MCL 780.972(1)(a). A defendant's apprehension of imminent harm need not be correct. *People v Burkard*, 374 Mich 430, 437-438; 132 NW2d 106 (1965), partial abrogation on other grounds recognized in *People v Heflin*, 434 Mich 482, 503 n 16; 456 NW2d 10 (1990); *Pond v People*, 8 Mich 150, 173-174 (1860). Rather, "the killing of another person is justifiable homicide if, under all the circumstances, the defendant honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force." *People v Riddle*, 467 Mich 116, 142; 649 NW2d 30 (2002). "[R]easonableness depends on what an ordinarily prudent and intelligent person would do on the basis of the perceptions of the actor." *People v Orlewicz*, 293 Mich App 96, 102; 809 NW2d 194 (2011).

The trial court's bench ruling was not a model of clarity, and some of the trial court's statements could, if taken out of context, be misconstrued as suggesting that the trial court misunderstood the facts or the applicable law. In particular, the trial court stated that everyone agreed that a physical altercation occurred. In fact, Johnson specifically and repeatedly asserted that there was no physical struggle at all, other than defendant pushing Johnson off when Johnson fell onto defendant, and that the shooting took place in "a blink." However, as the prosecutor pointed out at oral argument, the trial stretched over several days, the evidence was otherwise unanimous that a physical altercation occurred, and Johnson's description of the events could suggest a physical altercation notwithstanding Johnson's characterization of the events. In any event, it was harmless for the trial court to exaggerate the unanimity of the testimony regarding any physical altercation, because the evidence was overwhelming that a physical altercation did occur.[3]

The trial court also commented that " 'you can't bring a gun to a fist fight.' " When read out of context, that statement would not be universally true. For example, a person armed with a knife could claim self-defense in using deadly force to escape from being choked by an unarmed assailant. See *People v Marshall*, 366 Mich 498, 499-501; 115 NW2d 309 (1962). However, when read *in* context, it is apparent that the trial court merely intended to illustrate by analogy its conclusion that Fisher did not reasonably fear imminent death or imminent great bodily harm—a prerequisite to a successful self-defense claim. The altercation began as a fist fight and occurred in a marijuana dispensary. Fisher brought a gun to the dispensary, where he knew that the victim would be working. Fisher also admitted that there was "bad blood" between the two of them. As discussed, the trial court clearly made a credibility assessment and, other than concluding that defendant did not intend to kill Johnson, it found defendant's version of events incredible. Minor discrepancies between the testimony and the trial court's bench ruling aside, the trial court was permitted to credit Johnson's version of events over defendant's version of events, and the evidence supported a reasonable inference that Fisher went to the dispensary for the purpose of picking a fight with the victim and brought a gun in *anticipation* of that fight becoming violent.

---

[3] If anything, the fact that a physical altercation occurred favored defendant. As noted, the trial court found the evidence failed to show that defendant intended to kill Johnson.

Self-defense is generally not available to a person who was the initial aggressor and remained the aggressor throughout the confrontation. See *Heflin*, 434 Mich at 509.

Although the trial court might have chosen a blander expression, it was not obligated to do so. When properly read in context, the trial court's bench ruling clearly conveyed its conclusion that defendant was the initial aggressor in the situation and instigated an unfair fight by bringing a gun to bear on someone armed only with fists. Its conclusion was not against the great weight of the evidence.

## V. EFFECTIVE ASSISTANCE OF COUNSEL

Defendant further argues that trial counsel was ineffective for failing to introduce evidence of Johnson's prior arrests for assault. We disagree.

It was obviously critical to defendant's self-defense claim that defendant honestly and reasonably feared for his life despite being armed and Johnson not being armed. Furthermore, this matter clearly turned almost entirely on the relative credibilities of defendant and Johnson. Therefore, as a general matter, we would find questionable any defense strategy that omitted any readily-available, concrete, and admissible means of bolstering defendant's credibility. Although we need not and do not decide, it is not unreasonable to suppose that evidence corroborating defendant's testimony regarding the "bad blood" between himself and Johnson, or otherwise confirming that defendant had reason to be fearful of Johnson, could have made a difference to the outcome of the trial. However, arrest records are simply not admissible, except, perhaps, under rare circumstances to show that a witness is biased.[4] *People v Layher*, 464 Mich 756, 757-758, 765-769; 631 NW2d 281 (2001). Counsel cannot be ineffective for failing to advance a meritless or futile strategy. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). We have not been provided with an offer of proof, which we would be obligated to consider, *Moore*, 493 Mich at 933, regarding any other credibility-bolstering strategy that trial counsel should and could have pursued but instead neglected. We are therefore unable to conclude that defendant received ineffective assistance of counsel.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause

---

[4] Clearly, whether Johnson was biased against defendant was not an issue in this matter.