Donna PRICE, Personal Representative
of the Estate of Bernard Price,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 82–1473.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 4, 1983.

Decided March 2, 1984.

Clyde B. Pritchard, argued, Detroit, Mich., for plaintiff-appellant.

Leonard R. Gilman, U.S. Atty., Geneva S. Halliday, Asst. U.S. Atty., argued, Detroit, Mich., for defendant-appellee.

Before LIVELY, Chief Judge, and MERRITT and JONES, Circuit Judges.

MERRITT, Circuit Judge.

In this wrongful death case under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), the question is whether the District Court properly ruled that plaintiff had failed to prove by a preponderance of evidence that defendant's agents caused the wrongful death of plaintiff's husband. We reverse.

**I.**

During 1980, the Drug Enforcement Agency (DEA) was involved in the investigation of a large-scale drug conspiracy in Southern Genessee County, Michigan. In August, 1980, DEA Agent Calvin Poissot, who was attempting to serve a grand jury subpoena on a potential witness, was confronted by a suspect in the drug conspiracy investigation, Patrick Conway, who engaged the agent in a pushing and shoving incident. On September 11, 1980, agent Poissot and five other DEA agents, accompanied by a uniformed Michigan State Police Trooper named Fink, went to Conway's home to arrest him for the assault.

Conway's home is located on Lovejoy Road, a dirt road in rural Argentine, Michi-

gan. After determining that no one was at the residence, the six DEA agents and Trooper Fink left and headed east on Lovejoy in the direction of Detroit. Trooper Fink and agent Poissot were in the first of three cars. Agents Ronald DePottey and David Book were in a second vehicle, an Oldsmobile. Agents David Brondyk, James Allen Wooley, and Wilfred Garrett followed in a third car. As these three cars headed east on Lovejoy, agent Wooley in the third car observed a Buick Riviera, which had passed going west, turn into the Conway driveway.

Agent Wooley established radio contact with agents Book and DePottey and advised them of what he had seen and that he was turning around to investigate. Neither State Trooper Fink nor agent Poissot was aware of any new development, and they proceeded east on Lovejoy Road in the first and only marked vehicle to a predetermined rendezvous location in Linden, Michigan. In response to agent Wooley's radio message, agents Book and DePottey also turned back to the west and, as they came over a rise, observed agent Wooley talking with the decedent, Bernard Price. As agent Wooley's car reached the Conway driveway, decedent's car was coming back down the driveway; the two drivers rolled down their windows and spoke without getting out of their cars. Agent Wooley testified that he was trying to determine Conway's whereabouts without disclosing his own identity as a police officer. Agent Wooley also testified that he asked the decedent his name and that the decedent asked agent Wooley his name but that no information was exchanged between them.

After his conversation with the decedent, Wooley left Conway's residence and proceeded west on Lovejoy. As he started down the road, the decedent began to follow Wooley's vehicle at a very close distance. The Oldsmobile fell in behind the decedent's car. Wooley radioed to agent Book to do a registration check on the Buick's license because the car was so close to Wooley's car that Wooley could not see the Buick's plates in his rear view mirror.

Agent DePottey testified that Wooley radioed that he was going to pull off Lovejoy and that Wooley in fact did pull into the next driveway off Lovejoy, the Snyder residence, presumably to allow decedent to pass. The decedent, however, pulled into the semicircular driveway at the Snyder residence and parked from ten to twenty feet behind Wooley's car. Agent DePottey stopped his Oldsmobile on the road, partially blocking the driveway.

Agent Garrett got out of agent Wooley's car from the passenger side, crossed over to the driver's side of the Buick, and, pointing his shotgun at decedent through the partially opened window, identified himself as a police officer. Garrett also ordered the decedent to turn off his engine. Agents Wooley and Brondyk had also gotten out of Wooley's car with their guns drawn and were walking toward decedent's car. Wooley testified that he was wearing a "raid jacket," which bears a Department of Justice emblem on the shoulder and a replica of the DEA badge on the front.[1]

At this point, the decedent backed up his car and hit the Oldsmobile parked perpendicularly to the driveway. Agent Book testified that he was in the Oldsmobile when it was struck and that after the impact he got out of the car, opened the passenger side door of decedent's car, identified himself as an officer, stuck his .38 caliber in the decedent's face, and ordered the decedent to stop the vehicle. He testified further that the decedent then accelerated forward, throwing him toward the ground, and that

---

1. Although the District Court seems to place emphasis on the fact agent Wooley wore such a jacket and the decedent *may* have seen it, we note that during the decedent's conversation with agent Wooley, the two individuals remained in their cars, and the decedent could not, therefore, get a good look at the jacket at that time. It is also likely the decedent never got a look at agent Wooley's jacket during the incident in the Snyder driveway, because agent Wooley was not standing near the decedent and the decedent was already maneuvering his car in the driveway before he was ever in a position to get a good look at agent Wooley's jacket.

he fired his gun into decedent's back because he believed agents Wooley and Brondyk were in the path of the car. Agents Brondyk, Garrett, and DePottey testified, however, that agent Book was already out of the Oldsmobile when it was struck.

It is unclear from the testimony at trial how far forward the decedent's car may have moved before agent Book shot the decedent. Agents Wooley and Brondyk did testify, however, that, as the car moved towards them, they ran out of the way, and agent Wooley was able at the same time to fire two shots at the car's front tires. As the car passed by agents Wooley and Brondyk, agent Wooley fired three more shots at the tires. After being shot, the decedent accelerated his car forward out of the semicircular driveway and drove into an open lot to the east of the Snyder home and back out onto Lovejoy. The agents found the vehicle on the road and the decedent in a nearby field. The decedent, Bernard Price, was dead on arrival at the hospital.

The autopsy of decedent's body indicated he had died from agent Book's gunfire. The fatal shot entered decedent's back approximately seven centimeters left of the midline from the passenger side of the vehicle. The autopsy also revealed that decedent's blood contained .006 milligrams of cocaine per 100 millimeters and .1% alcohol at the time of the incident.

Plaintiff Donna Price, as personal representative, brought the instant action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), alleging that the conduct of defendant's agents caused the wrongful death of her husband, Bernard Price. Former United States District Judge Patricia Boyle of the Eastern District of Michigan entered judgment in favor of the defendant based on her ultimate finding that agent Book's belief that others' lives "were in danger of death or great bodily harm was reasonable under the circumstances" and that the use of deadly force was justified under the circumstances. Memorandum Opinion and Order Granting Judgment in Favor of Defendant, Joint Appendix at 17a. Although the Police Report indicates that the dece-

dent had been shot in the back while he was turned to the left looking to the rear over his left shoulder for an escape route, Judge Boyle noted that the bullet killing the decedent could have struck him as he was "attempt[ing] to pull himself back up over the steering wheel [after placing something under the passenger seat] or [the decedent] may have been looking to the left to ... verify ... the location of Garrett's shotgun." *Id.* at 15a.

## II.

■ The Federal Tort Claims Act provides that the government's liability in the instant action should be determined "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b), that is, Michigan law. Under Michigan law, the critical inquiries are whether agent Book shot the decedent in the belief that others' lives were in danger of death or great bodily harm and whether agent Book's belief was reasonable or honest under the circumstances. The belief does not have to be warranted as a matter of actual fact so long as it is reasonable. *People v. Burkard,* 132 N.W.2d 106, 374 Mich. 430 (1965).

■ Although the District Court in the instant case was moved by agent Book's testimony, we conclude that the District Court's finding that Agent Book's use of deadly force was reasonable is clearly erroneous.

For all the emotion and sincerity manifested in his testimony, agent Book's panic and confusion at the time of the shooting are evident. He testified that at the time of the shooting he had "never been so scared in all [his] life" and that "[t]here are still a lot of things that I don't understand [about] what happened [during the incident]." Tr. 106. Agent Book also testified that "I'm sorry that my statements are confusing because they are confusing to me; not only to everybody, but they are confusing to me." *Id.* Agent Book's confusion was confirmed by his testimony that he was in the Oldsmobile at the time the decedent's car struck it (contradicted by the

testimony of three other DEA agents at the scene), that the decedent's car rocked back and forth repeatedly (contradicted by the Laboratory Report compiled by the Michigan Department of State Police), and that he ran several steps with decedent's car before he shot the decedent (suggesting that the car was not moving so fast *at the time of the shooting* to constitute a real threat of danger).

The District Court's finding respecting the position of decedent's body at the time of the shooting overlooks the only plausible explanation for what decedent was doing at the time of the shooting. The finding contradicts directly the Laboratory Report of the Michigan State Police which states that "[t]he entrance wound was found in the left upper quadrant of the victim's back. This portion of the back is exposed to the passenger's side when the victim was turned around to the left, as if he were looking toward the rear of the vehicle outside the driver's door window." Joint App. at 30a. Agent Book testified that after the decedent first looked at agent Book and his pointed weapon, decedent then "turned his back to" him. Tr. 44. The only reasonable explanation is the one given in the lab report: when he was shot decedent's "back [was] exposed to the passenger's side . . . as if he were looking" to the rear for an exit. Under these circumstances, he was shot, and he then accelerated forward with agent Book firing wildly at the car.

The District Court noted that decedent's behavior in tailgating the DEA agents was suspicious, but ignored how suspicious those agents' behavior would have appeared to the decedent: agent Wooley never identified himself; the agents were in plain clothes; and the DEA vehicles were unmarked. Decedent did not know who these individuals were who had cornered him in the yard. Without any basis to fear the decedent and not even knowing decedent's identity, at least three agents approached decedent's car with weapons drawn. A citizen who has not done anything to arouse fear in police officers or provide probable cause for arrest is entitled to better treatment. The agents contributed to the ten-

sion and confusion present at the moment of confrontation.

Agents Brondyk and Wooley, whose lives agent Book was seeking to protect, had time to move out of the car's path and to shoot its front tires. These two agents, who were not completely defenseless, reasonably rejected the use of deadly force. Book's conduct, however, in shooting decedent in the back as he looked to the rear to find a way out was unreasonable.

Agent Book rejected without good reason the options of firing a warning shot, wounding the decedent, getting into the vehicle whose door was open, or shooting the car's tires. Shooting the decedent in the back under the circumstances of this case was not necessary to bring an end to a situation already made tense and confusing by the agents' own threatening conduct. Deadly force is a last resort and may only be used under Michigan law in life endangering situations or where there is a reasonable belief that such a situation exists. Agent Book was not authorized under the law to use deadly force as the most effective means to bring an uncertain situation to an end.

We do not agree with the dissenting view that we have "completely ignored" the clearly erroneous rule. The case turns on the accuracy of the reconstruction of the event by the Michigan Police Laboratory, and there is simply no credible evidence in the record which refutes that report. That report says:

These [blood] spatters are consistent with the victim being shot in the back from the passenger side of the vehicle thereby casting the spatters on the head liner while moving toward the driver's door. Larger drops of blood were found on the passenger seat and on the passenger door panel, possibly accountable by the recoiling action of the victim toward the passenger side. The driver's seat back was soaked with blood near the center and on the right side of the seat back about half way between the seat cushion and head

rest. No bullet holes were found within the interior of the victim vehicle.

Laboratory personnel reconstructed the possible positions where the driver's back would have been accessible to the shooter on the passenger side of the vehicle. The entrance wound was found in the left upper quadrant of the victim's back. This portion of the back is exposed to the passenger's side when the victim was turned around to the left, as if he were looking toward the rear of the vehicle outside the driver's door window.

There simply is no way the officer can justify shooting a person in this position in the back. This police shooting was completely unjustified, and we should not temporize on the issue. We note that the dissent cites no facts in support of its view.

We thus conclude that the District Court's findings of fact regarding the reasonableness of Agent Book's belief in using deadly force are clearly erroneous. Accordingly, we reverse the District Court's decision to enter judgment in favor of the defendant on liability and remand this action to the District Court for the award of damages.

LIVELY, Chief Judge, dissenting.

Hard cases make bad law. The sad facts of this case have led the majority to ignore completely the command of Rule 52(a), Federal Rules of Civil Procedure, "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The majority opinion is nothing more than a retrial of the case at the appellate level, giving little or no regard to the opportunity of the trial court to "judge of the credibility of the witnesses." The opinion draws inferences which are the opposite of those drawn by the trial judge from the same evidence, and this a federal appellate court may not do.

I would affirm the judgment of the district court.