38 F.3d 1215
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 ESTATE OF Rodney K. EDWARDS, by Yolanda Patricia EDWARDS,
Personal Representative, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 93-1365.
 United States Court of Appeals, Sixth Circuit.
 Oct. 17, 1994.
 
 Before: JONES, RYAN, and BATCHELDER, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Yolanda Edwards, the mother of Rodney Edwards, a drug dealer shot to death by a federal drug enforcement agent, appeals the district court's order entering judgment for the United States after a bench trial in this wrongful death action brought under the Federal Tort Claims Act, 28 U.S.C. Sec. 2671, et seq. We must decide whether the district court erred by applying an incorrect legal standard to the agent's claim of self-defense and the plaintiff's charge of negligence, and clearly erred in finding that the agent acted in self-defense and free from negligence when he shot and killed Rodney Edwards. We conclude that the district court did not err and affirm.
 
 I.
 
 2
 The killing that occasions this wrongful death suit occurred during an undercover drug bust gone awry. Abstracting the decisive facts, the case is uncomplicated. Special Agent Scott Roberts of the United States Drug Enforcement Agency participated in a joint investigation, along with personnel from other law enforcement agencies in southeastern Michigan, of an alleged narcotics conspiracy in Detroit, Michigan. An undercover drug buy was set up for the afternoon of January 9, 1989. Roberts was briefed for the first time on that morning and was assigned to a Michigan State Police Narcotics Unit supervised by Michigan State Detective Lieutenant L. Michael Knuth. Roberts and his group were charged with the task of surveillance.
 
 
 3
 The planned drug buy involved a substantial quantity of cocaine--two kilos with the promise that three more would follow. Roberts watched the drug dealers arrive on the scene by taxi and approach the undercover officers near the corner of Michigan Avenue and Martin Street in southwest Detroit. During this initial encounter, a white pick-up truck was circling the area in an effort at counter-surveillance. For some reason, the transaction stalled. The taxi pulled away. A group of officers followed it to a house in a nearby neighborhood. Roberts joined the officers there and saw the decedent Rodney Edwards come out of the house with two other men, Gavino Torres and Marco Olmeda. The three men chatted with a fourth, Anthony Valentin, on the front walk. Valentin then left in the taxi. Edwards, Torres, and Olmeda drove away in a gold and black 1974 Chevy Blazer. Special Agent Roberts returned to the vicinity of Michigan and Martin. He saw the taxi arrive along with the Blazer. The taxi proceeded to the parking lot of a nearby Burger King restaurant, and the Blazer circled the block in an effort at counter-surveillance. Shortly after the undercover officers took delivery of the cocaine, the other officers were signaled to arrest all of the participants in the drug sale, including the three men in the Blazer.
 
 
 4
 Roberts drove across the street and cut off the Blazer which Edwards was driving. Officer Knuth pulled his vehicle up near the driver's side of the windshield. Officer Burns approached from the passenger side and two other officers were at the rear. All of the officers but Roberts were wearing jackets and hats marked "POLICE." The officers jumped from their cars and ran toward the Blazer with their guns drawn shouting "Police! Put your hands up! Freeze!" The men in the car complied, putting their hands in the air. Roberts put his left hand on the driver's door handle and, with his right hand, held his gun pointed at Edwards in the driver's seat. As he opened the car door, Roberts heard a gunshot. He saw Edwards move his arms down and twist toward the right. Roberts fired his gun, shooting Edwards in the back. Edwards died almost immediately. No guns were found in the Blazer; the gunshot Roberts had heard just prior to shooting Edwards came not from the Blazer, but from Officer Burns who fired his shotgun at the front passenger side windshield of the Blazer.
 
 
 5
 Yolanda Edwards, Rodney Edwards' mother and the personal representative of her son's estate, brought a wrongful death action against the United States under the Federal Tort Claims Act, 28 U.S.C. Sec. 2671, et seq. She alleged that Special Agent Roberts intentionally assaulted and battered her son when Roberts used deadly force against Edwards without justification. She also alleged that Roberts was negligent in firing the shot that killed her son. She sought damages under Michigan's Wrongful Death Statute, M.C.L.A. Sec. 600.2922, in the amount of $1,797,196.52.
 
 
 6
 Following discovery, the district court held a five day bench trial. Special Agent Roberts testified and explained the circumstances surrounding the shooting. Roberts testified that when he opened the door to the Blazer, Edwards was sitting in the driver's seat with both hands in the air. Roberts did not see any weapons in the car. He explained that he knew that other officers were also rushing toward the Blazer, and that he was aware of Officer Burns approaching from the passenger side. Roberts said that when he heard the initial gun shot, he did not know whether it came from inside or outside the Blazer. He explained that he next saw Edwards twist his body very quickly toward the passenger side of the Blazer and drop down. At that point, Roberts said he thought the shot had come from inside the Blazer and that his life and the lives of his fellow officers were at risk. Roberts testified that he intentionally shot Edwards because he thought his own life was in danger.
 
 
 7
 Michigan State Police Trooper Michael Knuth testified that about twelve officers rushed the vehicle. He said that the officers were shouting commands and he could see that Edwards was complying. Knuth explained that he was unsure whether each of the suspects had their hands up; that he was looking directly at Edwards when he heard the first gun shot; and that Edwards had done nothing provocative.
 
 
 8
 Both parties presented witnesses in an attempt to establish the position of Edwards' body at the time of the fatal shot. Dr. Marilee Frazer, the assistant medical examiner for Wayne County who performed the autopsy on Edwards, testified that she initially concluded that the bullet had entered Edwards' chest from the front and exited through his back. Dr. Frazer changed her opinion, however, when she noted gunshot residue around the hole in the back of Edwards' jacket, and later amended the death certificate to indicate that the bullet travelled from back to front. Dr. Frazer stated that Edwards' arm could not have been near his chest where the bullet exited because the bullet would have entered or damaged the arm.
 
 
 9
 Dr. Werner Spitz, the Monroe County pathologist, reviewed the autopsy reports, the photographs of the body and the scene, and the jacket Edwards was wearing when he was shot. Dr. Spitz explained that the elliptical wound on Edward's back indicated that the bullet entered from an acute angle on the left and travelled toward the right. He explained further that the wound under the right arm was a shored exit wound, which left small lines around the opening. These lines, Dr. Spitz said, were caused by the weave pattern of the cloth which pressed against the body. Based on this shoring effect, the location of the fatal bullet on the driver's seat, and the absence of arm rests in the Blazer, Dr. Spitz concluded that Edwards' arm was down against his body and created the pressure that caused the shored exit wound. Dr. Spitz testified that Edwards' body absorbed the force of the bullet so that the bullet exited against the arm and dropped down onto the seat. He further explained that the absence of visible bruising on Edwards' arm was not determinative since deep bruising would not be seen on the surface if death occurred rapidly. Again, Dr. Spitz concluded that the most likely scenario was that Edwards' body was bent forward with his arm against the right side of his chest at the moment Roberts shot him. The significance of the testimony concerning the position of Edwards' right arm at the moment he was shot was, of course, to show that his arms were no longer in the air and that it would not have been unreasonable for Roberts to conclude that Edwards was turning to reach for a weapon.
 
 
 10
 Both parties also introduced expert testimony on the issue of the propriety of Agent Robert's actions as part of the arrest team. Frederick Postill, a former elected county sheriff, testifying as an expert for the plaintiff, stated that the officers should not have rushed the Blazer and that once Agent Roberts heard the shot, the only appropriate action was for him to tell Edwards to freeze. He also testified that an officer is not justified in firing until a weapon can be seen.
 
 
 11
 Special Agent Kimberly Loveless, an instructor at the DEA Academy in Quantico, Virginia, testified as a defense expert and explained that DEA agents are trained to make a decision regarding the use of deadly force within one-half to three-quarters of a second. She further explained that DEA policy permits the use of deadly force only in self-defense, but that agents are not required to actually see a weapon before shooting. After reviewing the police reports, photographs, pathology reports, and hearing the trial testimony, Agent Loveless expressed the opinion that the objective circumstances justified Robert's conduct. Loveless testified that when Roberts heard the shot and then saw Edwards move down and to the right, Roberts had an objective basis for concluding that his life was in danger.
 
 
 12
 After considering all the foregoing testimony along with the police report, the pathology report, the photographs and other evidence, the district court entered a judgment for the defendant. The court concluded that (1) Roberts acted in self-defense when he shot Edwards because Roberts' belief that his life was in danger was reasonable under the circumstances, and (2) Roberts was not negligent in firing his weapon because Roberts acted as any reasonable, prudent officer would have acted under like circumstances.
 
 II.
 
 13
 The Federal Tort Claims Act provides that the government's liability in this case should be determined "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. Sec. 1346(b), in this case the law of Michigan. The plaintiff argues that the district court applied an incorrect legal standard and made clearly erroneous factual findings in holding that Roberts' conduct was reasonable under the circumstances.
 
 A. Self-Defense
 
 14
 In People v. Doss, 276 N.W.2d 9 (Mich.1979), the Michigan Supreme Court set out the standard by which to judge whether a police officer is justified in using deadly force; the inquiry, it seems, hinges upon the facts of the particular case:
 
 
 15
 In Delude v. Raasakka, 391 Mich. 296, 303, 215 N.W.2d 685, 689 (1974), this Court said:
 
 
 16
 "The police have the right to use that force reasonable under the circumstances to effect ... an arrest. The police may also take what action is reasonable to protect themselves in the course of an arrest or an attempted arrest."
 
 
 17
 As to what constitutes "reasonable force", see 5 Am.Jr.2d, Arrest, Sec. 81, p. 768, where it is stated:
 
 
 18
 "What amounts to reasonable force on the part of an officer making an arrest usually depends on the facts in the particular case, and hence the question is for the jury. The reasonableness of the force used must be judged in the light of the circumstances as they appeared to the officer at the time he acted, and the measure is generally considered to be that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary under the circumstances. The officer has discretion, within reasonable limits, to determine the amount of force which the circumstances require, and he is not guilty of wrong unless he arbitrarily abuses the power confided in him."
 
 
 19
 Likewise, police officers making a lawful arrest may use that force which is reasonable under the circumstances in self-defense, and unlike the private citizen a police officer, by the necessity of his duties, is not required to retreat before a display of force by his adversary. See 40 Am.Jur.2d, Homicide, Sec. 137, pp. 427-428. However, like the private citizen, the police officer who claims self-defense must have reasonably believed himself to have been in great danger and that his response was necessary to save himself therefrom.
 
 
 20
 Id. at 13-14 (citations omitted) (emphasis added). In subsequent cases, the Michigan courts have continued to assess police officers' claims of self-defense under the Doss standard. See, e.g., J.C. Ealey v. Detroit, 375 N.W.2d 435, 437 (Mich.App.1985); People v. Khoury, 448 N.W.2d 836, 838 (Mich.App.1989). Most recently, the Michigan Court of Appeals declared: "We believe that what constitutes a reasonable belief of great danger is to be determined ... on the basis of all the facts and circumstances as they appeared to the party at the time of the incident." Alexander v. Riccinto, 481 N.W.2d 6, 8 (Mich.App.1992), appeal denied, 485 N.W.2d 564 (Mich.1992).
 
 
 21
 Michigan requires that an individual have an honest and reasonable belief that his life is in danger before he may successfully invoke the privilege of self-defense to a charge of intentional tort. People v. Garfield, 420 N.W.2d 124, 128-30 (Mich.App.1988); cf. Price v. United States, 728 F.2d 385, 387 (6th Cir.1984). Michigan's objective standard, then, requires that the factfinder consider the claim of self-defense in light of the facts and circumstances as they appeared to the defendant at the time. This is precisely the standard the district court applied below. The plaintiff argues that the district court relied too heavily on Roberts' "subjective beliefs". The plaintiff objects to the district court's references to Roberts' training, his knowledge about Edwards' involvement in the drug trade, and his fear that Edwards' might be armed. However, under Michigan law the factfinder must decide what is reasonable under the circumstances, and that, in part, depends on the actor's knowledge:
 
 
 22
 It is not necessary that the danger actually exist. It is only necessary that the actor have grounds that would lead an ordinary reasonable person to believe that it exists, and that he so believe. All the facts and circumstances of the case are to be taken into account to determine the reasonableness of the belief. Nor is actual belief by the actor that he is in danger enough to create the privilege. Again, the belief must be justified by the circumstances.
 
 
 23
 Fowler v. Harper, et al., The Law of Torts Sec. 3.11 at 311 (2nd ed. 1986) (footnotes omitted). On the issue of self-defense, Professor Prosser instructs that evidence as to the tortfeasor's state of mind and nerves, as well as evidence of the reputation of his victim, is critical to establishing what was reasonable under the circumstances. William L. Prosser, The Law of Torts Sec. 19 at 109 (4th ed. 1971). This view is consistent with the Restatement (Second) of Torts Sec. 65:
 
 
 24
 (1) [A]n actor is privileged to defend himself against another by force intended or likely to cause death or serious bodily harm, when he reasonably believes that
 
 
 25
 (a) the other is about to inflict upon him an intentional contact or other bodily harm, and that
 
 
 26
 (b) he is thereby put in peril of death or serious bodily harm or ravishment, which can safely be prevented only by the immediate use of such force.
 
 
 27
 In this case, the district court reviewed the evidence presented at trial to determine whether Roberts' belief that Edwards posed an immediate threat to his life and the lives of his fellow officers was reasonable under the circumstances as they appeared to Roberts at the time he fired the fatal shot. In light of Doss and its progeny, we conclude that the district court did not err in taking into account all of the factual circumstances in analyzing whether Roberts held an honest and reasonable belief that his life was in danger.
 
 
 28
 The plaintiff next argues that even if the district court applied the correct legal standard, its factual findings are clearly erroneous. The plaintiff points to a seeming inconsistency between Officer Knuth's testimony and Roberts'. Knuth was standing near Roberts at the time, and Knuth testified that Edwards did not do anything threatening and that Edwards had his hands in the air. Roberts testified that Edwards' hands were down and that Edwards was moving. But Knuth also testified that he ducked down as soon as he heard the first shot so there is some question as to how much he actually saw. Moreover, Knuth can recall hearing only one gunshot, when in fact there unquestionably were two. Roberts' testimony about Edwards having his hands at his side is further corroborated by Dr. Spitz's testimony that the shored exit wound indicated that Edwards had his arm against the side of his chest.
 
 
 29
 We review findings of fact by a district court for clear error. Fed.R.Civ.P. 52(a). "If a district court's account of the evidence is plausible ... the court of appeals may not reverse it even ... it would have weighed the evidence differently." Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985).
 
 
 30
 [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.
 
 
 31
 Id. at 575. The trial court is in a unique position to assess the candor and credibility of the witnesses and the worth of the evidence presented. A "finding of fact is clearly erroneous only when, though there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 394-95 (1948). In the final analysis, the job of weighing the evidence and crediting testimony belongs exclusively to the factfinder. We conclude that the district court did not clearly err in finding that Roberts' reasonably believed he was in danger.
 
 
 32
 Finally, the plaintiff argues that Edwards moved solely in a reflexive manner in responding to the initial gunshot. This may be so, but the issue is not why Edwards moved but how a reasonable law enforcement officer would interpret such a move. It is of no consequence that Edwards posed no actual danger, Harper, supra, Sec. 3.11 at 311. What matters, for purposes of assessing Roberts' claim of self-defense, is whether Roberts reasonably and honestly believed that Edwards posed an immediate threat to his safety. Sadly, Edwards' movement, as perceived by Roberts, was entirely consistent with a hostile purpose. Again, we may not disturb a factual finding unless we find clear error, and we find none here.
 
 B. Negligence
 
 33
 In McKay v. Hargis, 88 N.W.2d 456, 460 (Mich.1958), the Michigan Supreme Court announced the standard by which to judge a police officer's negligence:
 
 
 34
 We know of no better standard by which to determine a claim of negligence on the part of a police officer than by comparing his conduct ... to 'the care which a reasonably prudent man would exercise in the discharge of official duties of like nature under like circumstances.
 
 
 35
 Id. In Jenkins v. Starkey, 291 N.W.2d 170, 173 (Mich.App.1980), the Michigan Court of Appeals applied the standard to a claim that a police officer was negligent in using deadly force:
 
 
 36
 The traditional tort standard of negligence, "reasonably prudent man under like circumstances" governs in determining the standard of care applicable under the factual circumstances of the instant case. This standard allows the factfinder to determine that some factual circumstances reasonably require greater or lesser diligence than do other circumstances in order to constitute reasonable or due care.
 
 
 37
 Id., see also, Pleasant v. Zamieski, 895 F.2d 272, 278 (6th Cir.), cert. denied, 498 U.S. 851 (1990).
 
 
 38
 The district court applied the appropriate standard under Michigan law and found that Roberts was not negligent. The plaintiff appeals this finding but does not raise any specific objections in her brief except to claim that Roberts acted unreasonably. In the district court, the plaintiff argued that Roberts was negligent because (1) he did not know that Officer Knuth was standing next to him when he fired the shot, (2) he did not recall opening the car door, and (3) he failed to announce to Knuth that he was going to open the car door. These assertions of negligence are unpersuasive. The issue is whether Roberts acted reasonably under the circumstances. After hearing a gunshot and seeing the suspect lean forward and to the right, Roberts reacted to what appeared to be an immediate threat to his safety. The district court was justified in concluding that Roberts' reaction in the circumstances was not unreasonable.
 
 III.
 
 39
 For the foregoing reasons, the district court's judgment for the defendant is AFFIRMED.
 
 
 40
 NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.
 
 
 41
 I concur in the majority's determination that the correct legal standard was applied by the district court to determine the propriety of Officer Roberts' actions. However, because I find that standard compels the conclusion that Roberts did not act reasonably when he shot and killed Rodney Edwards, I dissent.
 
 
 42
 Under Michigan law it is not enough that a police officer hold an honest belief that he is in danger. In addition, this belief must be reasonable under the circumstances before his use of deadly force in self-defense will be legitimate. People v. Doss, 276 N.W.2d 9, 14 (1979). In the instant case, Officer Roberts has asserted that his actions were reasonable because the initial shot from Officer Burns' weapon led him to believe that Edwards and his companions were armed and firing upon Roberts and his fellow officers. The majority accepts Roberts' assertion as tenable, relying upon the fact that Edwards' hands were at his side, and thus out of view, at the time of his murder. See Majority Op. at 10. Presumably the majority regards this as evidence of the legitimacy of Roberts' belief that Edwards had fired the first shot, thus making reasonable Roberts' perception that Edwards was a threat. However, in light of the other evidence, which the majority has apparently disregarded, I cannot agree that Roberts' belief that Edwards fired the first shot was reasonable.
 
 
 43
 It is undisputed that Roberts and the other officers saw no weapons in the Blazer prior to Burns shooting his weapon. It is also undisputed that after the Blazer was stopped, Edwards sat with his hands raised in compliance with police orders. At no point prior to the initial shot being fired did Edwards change his position of submission. See J.A. at 134, 170-75. However, notwithstanding this undisputed evidence, the majority nevertheless finds that Edwards' movement just after Officer Burns' weapon was discharged made reasonable Roberts' belief that this initial shot emanated from Edwards. Contrary to the majority's position, any movement by Edwards just after the initial shot was fired is hardly support for an assumption that Edwards was firing upon the officers.
 
 
 44
 In light of the foregoing, I find that Officer Roberts could not have reasonably believed that an unarmed Edwards, sitting in the Blazer with his hands raised, was the source of the perceived threat created by the initial gunshot. Although the discharge of Officer Burns' weapon certainly created a reasonable fear that someone was firing upon the officers, under the facts of this case it was unreasonable for Roberts to believe that this someone was decedent Edwards.
 
 
 45
 Though I readily endorse granting police officers adequate discretion to safely and effectively carry out their designated functions, I believe that the majority today has unwisely expanded this latitude by condoning an execution. I refuse to believe that police discretion extends so far, and so I dissent.