*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0324p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JUAN-JOSE GUERRA MORALES,

      *Plaintiff-Appellant,*

    *v.*

UNITED STATES OF AMERICA,

      *Defendant-Appellee.*

No. 03-1743

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-74269—Robert H. Cleland, District Judge.

Argued: October 27, 2004

Decided and Filed: May 27, 2005[*]

Before: NELSON and COOK, Circuit Judges; WEBER, District Judge.[**]

---

**COUNSEL**

**ARGUED:** Vernon R. Johnson, FIEGER, FIEGER, KENNEY & JOHNSON, Southfield, Michigan, for Appellant. William L. Woodard, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Vernon R. Johnson, James J. Harrington IV, FIEGER, FIEGER, KENNEY & JOHNSON, Southfield, Michigan, for Appellant. William L. Woodard, Mary S. Rigdon, UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

**OPINION**

---

    DAVID A. NELSON, Circuit Judge. This is an appeal from a judgment for the United States in an assault-and-battery action brought against it under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) and 2671 *et seq.* Sitting as the trier of fact, the district court found that a federal agent was in reasonable fear for her life when she shot and seriously injured the plaintiff. We are not persuaded that this finding was clearly erroneous. The challenged judgment will therefore be affirmed.

---

[*] This decision was originally issued as an "unpublished decision" filed on May 27, 2005. On July 19, 2005, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable Herman J. Weber, United States District Judge for the Southern District of Ohio, sitting by designation.

I

Special Agent Dawn Ohanian, of the United States Drug Enforcement Agency, shot the plaintiff, Juan-Jose Guerra Morales, while he was participating in an armed robbery attempt during an undercover drug transaction. A bullet struck Mr. Morales in the spine, paralyzing him from the waist down.

Mr. Morales sued the United States and Agent Ohanian under Michigan law, the Federal Tort Claims Act, and the United States Constitution. After certifying that Agent Ohanian was acting within the scope of her employment at the time of the shooting, the United States was substituted for the agent as a party defendant with respect to certain of the claims. The district court dismissed the constitutional claims against both defendants, and a negligence claim was dismissed by agreement of the parties. The case went to trial on the theory that Agent Ohanian's actions constituted an assault and battery for which the United States was liable under the Federal Tort Claims Act.

The district court's factual findings included the following:

— Agent Ohanian was a trained DEA agent with five years of law-enforcement experience. Her training and experience taught her that robberies can occur during drug transactions and that participants in drug transactions are often armed. She understood that law enforcement officers are permitted to use deadly force if their own or third parties' lives are in imminent danger.

— On December 3, 1997, a confidential informant introduced Agent Ohanian to Raul Guerrero. The agent showed Mr. Guerrero a bag containing $48,000 in cash and arranged to purchase cocaine from him the following day, using the money to pay for the drugs.

— Mr. Guerrero, Mr. Morales, and a third man, Walt Morris, met later in the day and made plans to rob Agent Ohanian at gunpoint. The gun was not to be loaded.

— On December 4, 1997, Agent Ohanian arranged to meet Mr. Guerrero at a motel in Taylor, Michigan, to complete the sale of cocaine. Mr. Guerrero drove to the motel in one car, while Messrs. Morales and Morris were driven there by Guerrero's sister in a second car. The group did not bring any cocaine with them.

— At least 12 law enforcement officers were stationed in and around the motel. Seven were in automobiles in the immediate vicinity, and four were in a room adjacent to Room 204, the room where Agent Ohanian planned to complete the cocaine transaction. Officer Ronald Bodek was carrying the purchase money. The officers, all of whom were armed, could communicate with one another using radios, pagers, and wireless telephones. Video surveillance of events in Room 204 was conducted by the officers in the adjacent room.

— Agent Ohanian met Mr. Guerrero in the motel parking lot. Guerrero's sister parked nearby and remained in the car as Messrs. Morales and Morris got out. The agent noticed them and asked Mr. Guerrero whether they were "his people." When Guerrero said that they were, the agent told him to call them over. He did so.

— At that point Mr. Morales took the lead in dealing with Agent Ohanian. He demanded to see the $48,000. The agent phoned Officer Bodek and another officer, and they agreed that Bodek would meet her and one of the sellers in Room 204 with the cash. The agent chose Morales to accompany her to the room.

— While awaiting Officer Bodek's arrival, Agent Ohanian sat on the edge of a bed in the middle of the room. Mr. Morales sat in a chair next to the door. From talking with Morales and observing his demeanor, the agent concluded that he was experienced in the drug trade.

— Before Officer Bodek reached Room 204, he saw Mr. Morris in the open-air corridor outside the room. Morris approached the officer, who told him to keep his hands out of his pockets. The two men then walked up to the door, and the officer knocked.

— Agent Ohanian stood up and went across the room to answer the knock. Mr. Morales remained seated. When the agent opened the door, Officer Bodek stepped forward. Mr. Morris moved forward as well and pulled out an unloaded semi-automatic pistol. Officer Bodek grabbed Mr. Morris' hands or arms, and the two men retreated into the corridor as they grappled for the gun.

— Agent Ohanian pulled out her own pistol. Mr. Morales, meanwhile, got up from his chair and moved behind Agent Ohanian, raising his arms from his sides. Morales moved out the doorway, coming into contact with Agent Ohanian's back. The agent saw Morales move behind her, felt him touch her back, and concluded that Morales, like Morris, posed a deadly threat.

— Agent Ohanian fired three shots at Mr. Morris from close range. Morris continued to struggle after being hit, but he was soon subdued by Officer Bodek. Mr. Morris later died from his injuries.

— When Mr. Morales heard the first shot, he turned away from Agent Ohanian and began to run down the hallway to his left. The agent turned after firing at Morris and briefly made eye contact with Morales, who glanced behind him as he went. The agent came closer to Morales and saw his left hand move in front of his body. Agent Ohanian feared that Morales was reaching for a gun and might shoot if he could reach the corner of the hallway and use it for cover. The corner was about 20 feet from the door to Room 204.

— Agent Ohanian fired two shots at Mr. Morales. One bullet hit him and lodged in his spine. Morales fell and the agent immediately stopped firing. From the first shot at Mr. Morris to the last shot at Mr. Morales, the incident took less than three seconds.

— Mr. Morales was not armed at the time of the shooting.

— Agent Ohanian did not announce that she was a law enforcement officer before opening fire.

On the basis of these facts the district court concluded that it was objectively reasonable for Agent Ohanian to believe that Mr. Morales presented a threat of imminent danger. In the court's view, "Ohanian was reasonably fearful that Morales would very quickly reach a place of cover at the near end of the corridor, from where he would be able to shoot at Ohanian and/or Bodek." The court also found that it was not feasible for Agent Ohanian to announce her status before shooting and that it would not have been "prudent or professional" for the agent to seek cover in Room 204 rather than engaging Morales.

After the district court entered judgment in favor of the United States, Mr. Morales perfected a timely appeal.

II

Because the shooting occurred in Michigan, the law of that state governs Mr. Morales' claim under the Federal Tort Claims Act. See 28 U.S.C. § 1346(b); *Price v. United States*, 728 F.2d 385, 387 (6th Cir. 1984). Michigan law is such that the United States cannot be held liable if Agent Ohanian reasonably believed, at the time of the shooting, that Morales posed an imminent threat of death or serious bodily harm. See *Price*, 728 F.2d at 387; *Alexander v. Riccinto*, 481 N.W.2d 6, 8 (Mich. App. 1991), *appeal denied*, 485 N.W.2d 564 (Mich. 1992). See also *People v. Heflin*, 456 N.W.2d 10, 18-19 (Mich. 1990) (holding that the use of deadly force is justified "if the defendant honestly and reasonably believes that his life is in imminent danger or that there is a threat of serious bodily harm"). Such a belief "does not have to [have been] warranted as a matter of actual fact so long as it [was] reasonable." *Price*, 728 F.2d at 387.

"[W]hat constitutes a reasonable belief of great danger is to be determined by the jury" – or, in this case, by the court in its role as fact-finder – "on the basis of all the facts and circumstances as they appeared to the party [who used deadly force] at the time of the incident." *Alexander*, 481 N.W.2d at 8. The district court's findings of fact may not be disturbed on appeal unless they are clearly erroneous. See Fed. R. Civ. P. 52(a); *Overton Distributors, Inc. v. Heritage Bank*, 340 F.3d 361, 366 (6th Cir. 2003).

It is beyond dispute, we believe, that when Agent Ohanian saw and felt Mr. Morales move behind her as she stepped forward to aid Officer Bodek, she reasonably believed that Morales posed a threat to her life. The agent's training and experience told her that Morales was probably armed. She knew that Morales' accomplice, Mr. Morris, had drawn a gun and that the drug transaction had turned into an attempted armed robbery. When she saw Morales move behind her and felt something touch her back, she knew that Morales was an active participant in the robbery. At that time she concluded that Morales posed "a deadly threat." We have no reason to suppose that her conclusion was anything but reasonable.

Mr. Morales contends that it was unreasonable of Agent Ohanian not to revise her assessment of the threat when, after shooting Mr. Morris, she turned to her left and saw Morales moving away from her. We are not persuaded that the district court committed clear error in rejecting that contention. For one thing, Morales' flight did not rule out the possibility of an attack. Morales' glance at the agent, the movement of his hand in front of his body, and the proximity of a corner that could provide him cover all suggested that Morales could still pose a threat.

Moreover, these events occurred very quickly and fluidly. The district court found that "this was not a series of discrete events which can be separated into two distinct shootings requiring Ohanian to respond to Morales' threat in a manner different from that with which she responded to the threat from Morris. It was, rather, one continuous response to a rapidly evolving situation in which four people were involved." Having reviewed the evidence, including an audio/video recording taken from the inside of Room 204, we see no basis for rejecting that finding.[1] In the circumstances presented here, we do not think it was unreasonable for Agent Ohanian to act without pausing to reassess the question of whether Mr. Morales posed a deadly threat.

Mr. Morales argues that this case is controlled by *Price v. United States*, where a DEA agent was held not to have been justified in shooting the plaintiff's decedent in the back. It seems to us,

---

[1]Because it was made from inside the motel room, the video recording captured only the portion of the corridor that was directly in front of the open doorway. The video shows Agent Ohanian moving towards Officer Bodek and Mr. Morris, Mr. Morales moving behind the agent, Morales turning and running to his left, and the agent turning and following Morales, but it does not show agent Ohanian shooting Morales. Nor does it show how Morales was positioned, or what he was doing, when he was shot.

however, that *Price* is distinguishable.  The man who was shot in *Price* had "not done anything to arouse fear in police officers" before the agent opened the man's car door and pointed a gun at him.  *Price*, 728 F.2d at 388.  The agent fired when the man started driving toward two other officers, even though those officers "had time to move out of the car's path and to shoot its front tires."  *Id.* We concluded that there had been no point at which it was reasonable for the agent to fear imminent danger to himself or the other agents.  See *id.* at 389.

In the case at bar, by contrast, it was obviously reasonable for Agent Ohanian to  believe there was imminent danger when Mr. Morales moved behind her and touched her back during the attempted armed robbery.  The real question, in our view, is whether it was reasonable for the agent to continue in that belief once Morales began moving away from her.  *Price* does not speak to this question, let alone compel a negative answer.

Citing authority for the proposition that "[d]eadly force is a last resort," *Price*, 728 F.2d at 388, Mr. Morales argues that Agent Ohanian should have announced herself as a federal agent before shooting.  He also argues that instead of shooting she should have retreated into Room 204.  But given the "rapidly evolving situation" in which Agent Ohanian found herself – a situation that spanned less than three seconds – we cannot say that the district court clearly erred in finding that a shouted warning was not feasible.  Mr. Morales might have drawn a weapon and fired in the time it took Agent Ohanian to announce her identity.  Nor can we say that the court clearly erred in finding that it would have been irresponsible of Agent Ohanian to retreat into the room, thereby leaving Officer Bodek exposed in the corridor.

The key to this case, it seems to us, is the fact that Agent Ohanian reasonably perceived Mr. Morales to pose a deadly threat approximately three seconds before she shot him.  We do not think law enforcement officers can be expected to revise such perceptions on a second-by-second basis in fast-moving situations such as the one in which Agent Ohanian found herself.  In circumstances of this sort, where a second or two might mean the difference between life and death, officers must be permitted to protect themselves and one another without waiting to see whether a mortal threat dissipates. We are satisfied that the district court did not clearly err in finding that Agent Ohanian's fear of death or serious bodily harm was reasonable at the moment Mr. Morales was shot.

**AFFIRMED**.